IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| NATALIE ROSE SANDY FERGUSON, | ) | CASE NO. 4:20-cv-02613 |
| | ) | |
| Plaintiff, | ) | DISTRICT JUDGE |
| | ) | DAN AARON POLSTER |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL | ) | AMANDA M. KNAPP |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Natalie Rose Sandy Ferguson ("Plaintiff" or "Ms. Ferguson") seeks judicial
review of the final decision of Defendant Commissioner of Social Security ("Commissioner")
denying her application for Child Disability Benefits ("CDB"), Disability Insurance Benefits
(DIB"), and Supplemental Security Income ("SSI").  (ECF Doc. 1.)  This Court has jurisdiction
pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate
Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the final decision of
the Commissioner be **VACATED** and that the case be **REMANDED**, pursuant to 42 U.S.C. §
405(g) sentence four, for further proceedings consistent with this Report and Recommendation.
On remand, the ALJ should provide a full, accurate, and complete explanation for the weight
given to the medical opinions of psychiatric consultative examiner Vernon Brown, Ph.D. and
state agency psychiatric consultants Joseph Edwards, Ph.D. and Kristen Haskings, Psy.D.

1

## I.  Procedural History

On June 6, 2016, Ms. Ferguson filed applications for CDB, DIB, and SSI, alleging disability beginning November 13, 2015.  (Tr. 330, 317, 324.)  She alleged disability due to Asperger's Syndrome, attention deficit hyperactivity disorder ("ADHD"), posttraumatic stress disorder ("PTSD"), obsessive-compulsive disorder ("OCD"), high cholesterol, high blood pressure, fast heartbeat, anxiety, and hearing problems.  (Tr. 81.)  Ms. Ferguson's application was denied at the initial level (Tr. 112-113) and upon reconsideration (Tr. 144-145), and she requested a hearing (Tr. 206-207).  On May 8, 2018, a hearing was held before an Administrative Law Judge ("ALJ").  (Tr. 225.)

On June 8, 2018, the ALJ issued a decision finding that Ms. Ferguson had not been under a disability within the meaning of the Social Security Act.  (Tr. 146-162.)  Ms. Ferguson appealed this decision (Tr. 261-262), and the Appeals Council issued an Order remanding the case to a new ALJ on August 2, 2019 (Tr. 169-170.)  On February 6, 2020, a new ALJ conducted a hearing pursuant to the Appeals Council remand.  (Tr. 40-79.)  On March 5, 2020, the ALJ issued a decision finding that Ms. Ferguson had not been under a disability within the meaning of the Social Security Act from November 13, 2015 through the date of the decision.  (Tr. 15-33.)  On September 18, 2020, the Appeals Council denied Ms. Ferguson's request for review, making the ALJ's March 5, 2020 decision the final decision of the Commissioner.  (Tr. 1-5.)

On November 20, 2020, Ms. Ferguson filed a Complaint challenging the Commissioner's final decision.  (ECF Doc. 1.)  Briefing has been completed in the case.  (ECF Docs. 16, 19, 20.)

## II.  Evidence

### A.      Personal, Educational, and Vocational Evidence

Ms. Ferguson was born in 1996, and was less than 22 years old on the alleged disability onset date, making her a "younger individual" under Social Security regulations at all relevant times.  (Tr. 18, 31.)  She had at least a high school education and was able to communicate in English.  (Tr. 32.)  She had no past relevant work, meaning no work at substantial gainful activity levels.  (Tr. 19, 30.)  Although she engaged in some work activity in 2016, after the November 13, 2015 alleged onset date, her earnings were below substantial gainful activity levels.  (Tr. 19.)

### B.      Medical Evidence

Although Ms. Ferguson has physical medically determinable impairments that were identified by the ALJ (Tr. 19), she only challenges the ALJ's decision regarding her mental impairments.  (ECF Doc. 16; ECF Doc. 20.)  The evidence summarized herein is accordingly focused on evidence pertaining to her mental impairments.

#### 1.       Treatment History

On February 2, 2015, Christopher Kalinyak, a nurse practitioner at Columbiana County Mental Health Clinic ("CCMHC"), performed an initial psychiatric evaluation of Ms. Ferguson. (Tr. 578-79.)  NP Kalinyak noted Ms. Ferguson had recently moved to Ohio from Florida, where she had been treated for Asperger's, PTSD, and ADHD, and was currently in her senior year of high school, taking mainstream classes with IEP support and accommodations.  (Tr. 578.)  He noted she was adopted at six years of age, and had lived in a "terribly abusive environment" before that time.  (*Id*.)  She was taking Zoloft, Clonidine, Trazodone, and Intuniv.  (*Id*.)  Mental status examination results included good concentration and focus, monotone speech, good sleep,

improving memory, no psychosis, some angry outbursts that were controllable, good eye contact, and mood and affect that were steady and consistent with reflection.  (*Id*.)  NP Kalinyak continued her medications and recommended supportive therapy.  (Tr. 579.)

Ms. Ferguson returned to CCMHC for individual therapy on March 3 and 25, 2015, and April 12, 2015, with the goal of improving her ability to manage her impulsivity and improve her family relationships.  (Tr. 551, 553, 554.)  At the third session, Ms. Ferguson reported she was doing well and had no issues, and appointments were decreased due to improvement.  (Tr. 554.)  On May 26, 2015, Ms. Ferguson returned for individual therapy and informed her therapist that she did not want to continue therapy.  (Tr. 557.)  Her therapist agreed "she has not been bringing issues to therapy that seem to require psychotherapy," and therapy was terminated.  (*Id*.)

Ms. Ferguson returned to CCMHC on July 30, 2015, for medication management with Nurse Practitioner Linda Boyle.  (Tr. 580-82.)  She reported that she had stopped taking Intuniv since graduating from high school, and she and her mother agreed she did not need it.  (Tr. 581.)  On examination, she demonstrated logical and linear thoughts, adequate concentration, clear speech, euthymic mood, no angry outbursts, and bright affect.  (*Id*.)  She reported she was enjoying living in a group home with her sister, and enjoyed reading.  (*Id*.)  NP Boyle continued her prescriptions for Zoloft, Trazodone, and Clonidine, held Intuniv, and recommended continued case management services.  (*Id*.)

On August 28, 2015, Dr. Ashraf Elguizaoui made a home visit for Ms. Ferguson due to "behavior impairment," noting that she presented with disturbances of thinking that moderately limited her activity, and fatigue which did not limit her activity.  (Tr. 649.)  She reported symptoms of anxiety and depression.  (Tr. 650.)  On examination, Dr. Elguizaoui noted psychosis and "mental retardation," but with no tics and normal psychomotor activity.  (Tr. 651.)

4

He diagnosed ADHD, PTSD, malaise, and fatigue.  (*Id.*)  He noted active prescriptions for

Clonidine, Sertraline, and Trazodone.  (Tr. 649, 651-52.)

On October 29, 2015, Ms. Ferguson reported to NP Boyle that she had left her group

home to share an apartment with her sister, which was going well.  (Tr. 583-84.)  Her mental

status examination included relevant thoughts, adequate concentration, clear speech, euthymic

mood, full affect, no angry outbursts, and bright affect.  (*Id.*)  She reported sleeping well, and

continued to enjoy reading.  (*Id.*)  NP Boyle noted her mood was stable, and she was tolerating

the medications with no side effects.  (*Id.*)  NP Boyle continued her prescriptions for Zoloft,

Trazodone, and Clonidine, and recommended continued case management services.  (*Id.*)

Ms. Ferguson returned to NP Boyle on January 5, 2016.  (Tr. 585.)  She reported working

at Papa John's Pizza for one to two days per week, which she enjoyed and was "going well."

(Tr. 585-86.)  On examination, she demonstrated reality-based thoughts, adequate concentration,

clear speech, euthymic mood, bright affect, and no angry outbursts.  (Tr. 586.)  She reported

sleeping well, and said she continued to enjoy reading and working part-time.  (*Id.*)  NP Boyle

noted that her mood was good and she was tolerating the medications with no side effects,

continued her medications, and recommended continued case management services.  (*Id.*)

On January 6, 2016, Ms. Ferguson and her sister met with CCMHC Qualified Mental

Health Specialist ("QMHS") Jaimie Rice at their home for community psychiatric supportive

treatment ("CPST").  (Tr. 1035.)  Ms. Ferguson reported that she was working, attending church,

and going to self-defense classes, and that her mother was transporting her to doctor's

appointments and taking her to get groceries.  (*Id.*)  She had been working nearly a month, and

was excited to get her first paycheck that day.  (*Id.*)  She was also looking forward to having

someone come help her and her sister with laundry and cooking.  (*Id.*)

QMHS Rice returned for a home visit with Ms. Ferguson and her sister on January 13, 2016.  (Tr. 1037.)  Ms. Ferguson reported continuing to work when scheduled, and said her mother had assisted her with opening a bank account, as well as taking her to get groceries.  (*Id*.)  She and her sister had been fighting about chores, because Ms. Ferguson did not want to do housework, but they also enjoyed watching Netflix and playing games together.  (*Id*.)  At the next home visit, on January 20, 2016, Ms. Ferguson reported she was working a couple of days a week.  (Tr. 1039.)  She felt it was going well, and had made new friends at work.  (*Id*.)

At QMHS Rice's next home visit on February 17, 2016, Ms. Ferguson reported working one day a week, and felt it was going well.  (Tr. 1046.)  She continued attending church and going to self-defense classes.  (*Id*.)  At a home visit on February 24, 2016, Ms. Ferguson reported she normally worked only on Saturdays, but had been called in to work on a Wednesday, which made her a little nervous.  (Tr. 1048.)  At a home visit, on March 2, 2016, QMHS Rice noted Ms. Ferguson was groomed and in a good mood, and reported that the Wednesday shift had been hard; she was able to keep up, but that she liked working on Saturdays better.  (Tr. 1050.)  Ms. Ferguson reported successfully ordering medication refills herself.  (*Id*.)  At home visits on March 9, March 16, March 30, and April 6, 2016, Ms. Ferguson reported continuing to work at the pizza shop for a few hours on Saturdays, and enjoying the job.  (Tr. 1052, 1054, 1056, 1058.)

Sandra Robinson, D.O. made a house call to Ms. Ferguson on March 28, 2016, due to "behavior impairment" and difficulty with transportation.  (Tr. 632.)  Dr. Robinson noted borderline hypertension, hyperlipidemia, and stable depression.  (*Id*.)  Psychiatric examination results were normal, and no psychiatric medications were prescribed.  (Tr. 634-35.)

On April 5, 2016 Ms. Ferguson returned to NP Boyle for medication management, reporting that she worked four hours a week at the pizza shop. (Tr. 588-89.)  Mental status

examination results included logical thoughts, adequate concentration, clear speech, euthymic mood, and bright affect.  (Tr. 589.)  She reported sleeping well, and said she enjoyed reading and playing video games.  (*Id*.)  NP Boyle noted she was tolerating the medications with no side effects, continued her prescriptions for Zoloft, Trazodone, and Clonidine, and recommended continued case management services.  (*Id*.)

At an April 13, 2016 home visit, Ms. Ferguson reported to QMHS Rice that she was unsure whether she would be working at the pizza shop that weekend, but had been helping her Dad with remodeling his new house.  (Tr. 1060.)  At a home visit on April 20, 2016, she reported continuing to help her dad fix up the house, but was unsure if she was working at her job that weekend; QMHS Rice encouraged her to call her supervisor to find out.  (Tr. 1062.)  At a home visit on April 27, 2016, Ms. Ferguson reported continuing to help her father with the house, and reported that she would be working at her job on Saturday; she continued to report the job was going well.  (Tr. 1064.)

At a May 11, 2016 home visit, Ms. Ferguson reported enjoying new books and showed QMHS Rice her recipe collection, but reported she only used the oven when her mother or father was present.  (Tr. 1066.)  QMHS Rice observed that Ms. Ferguson and her sister had neglected to put their belongings away, and encouraged them to clean up and sweep the floors.  (*Id.*)

On May 30, 2016, cardiologist Mark Fildes, M.D. noted that an event monitor which Ms. Ferguson wore at home showed no true arrhythmias and no premature beats of any kind.  (Tr. 616.)  He suspected her issues – including reports of palpitations and heart racing – were most likely related to anxiety instead of a heart condition.  (*Id*.)

At a June 1, 2016 home visit, Ms. Ferguson reported that she hadn't worked since she had worn the heart monitor, and was upset about it.  (Tr. 1072.)  She said her mother had

encouraged her to apply for SSI, and that she might apply for another job, possibly at Pizza Hut. (*Id*.) Her mother had also asked her to clean the living space, which had been getting out of hand, and she had picked up around the house. (*Id*.)

Dr. Robinson made a home visit on the same day, noting she was appropriate for house call services because she was an "adult patient who requires another person to accompany them to doctors' visits, behavior impairment, impaired cognition, morbid obesity, referred by health plan due to unmet care needs and requires assistance/special transportation." (Tr. 624.) Office notes indicated the frequency and intensity of services was driven by "high risk for decompensations," the need for ongoing assessment as a vulnerable adult, and the need to monitor compliance with multiple medications for multiple chronic diseases. (*Id*.) Ms. Ferguson was "[d]efined as unable to work; cares for self; unable to carry on normal activity or do active work." (*Id*.) Dr. Robinson noted Ms. Ferguson had hypertension that was exacerbated by stress, which worsened her anxiety and confusion. (*Id*.) Ms. Ferguson's anxiety was characterized by agitation and social phobia, made worse by crowds and public places, family discord, or stress, which moderately limited her activity. (*Id*.) Findings pertinent to her anxiety included tachycardia. (Tr. 624-35.) Psychiatric examination results were all within the normal range except for anxious mood and rapid speech. (Tr. 627.) He referred her to cardiology for the tachycardia, noting her blood pressure was controlled on medications. (Tr. 628.)

At the next home visit with QMHS Rice, on June 8, 2016, Ms. Ferguson was upset that her employer hadn't called her back to work. (Tr. 1074.) She also expressed a desire to use her own bank account if she got SSI benefits, and QMHS Rice advised her to check with her mother, who was her payee. (*Id*.) At a June 22, 2016 home visit, QMHS Rice spoke with Ms. Ferguson's mother, who explained that she had called Papa Johns and was told that they had not

scheduled Ms. Ferguson to work because she did not want to work.  (Tr. 1078.)  The employer told her mother: "She would constantly ask to leave early, and was slow at the tasks she was asked to do."  (*Id*.)  Ms. Ferguson's mother indicated she wanted her daughters to live in an apartment further from their parents, to facilitate independence, and requested help with applications for low-income housing and someone to help with laundry and housekeeping.  (*Id*.)  Ms. Ferguson reported that she and her siblings were able to ride bikes together.  (*Id*.)

On July 6, 2016, Ms. Ferguson reported to QMHS Rice that she and her siblings had been attending Peer Resource and Recovery Center ("PRRC"), where she "had a good time, learning about nutrition and coloring."  (Tr. 718.)  She and her sister were caring for their parents' dog while they were away, and attended self-defense classes together.  (*Id*.)

On July 26, 2016, Ms. Ferguson attended medication management with NP Boyle, where she reported that she was no longer working at the pizza shop because "they just quit putting her on the schedule."  (Tr. 854.)  Her mother attended the visit with her.  (*Id.*)  NP Boyle noted Ms. Ferguson had restricted affect, stable mood, relevant thoughts, was neat and clean, and reported no side effects from her medications.  (*Id*.)  Ms. Ferguson reported sleeping well, and enjoyed video games and reading.  (*Id*.)  NP Boyle continued her medications.  (*Id*.)

On July 29, 2016, Ms. Ferguson received a house call from Nurse Practitioner Sarah Noggle, who noted in home services were appropriate due to "behavior impairment." (Tr. 769.)  NP Noggle noted that all psychiatric examination results were in the normal range.  (Tr. 770.)  In cognitive screening notes, NP Noggle indicated "No" to "[d]etection of cognitive impairment," but "Yes" to "impairment or risk."  (Tr. 771.)  When questioned regarding independent activities of daily living, Ms. Ferguson denied needing help with medications, but admitted needing help preparing meals, obtaining transportation, and managing finances.  (Tr. 773.)

NP Noggle made another house call on September 2, 2016, this time indicating services were appropriate due to "mental retardation." (Tr. 764.) Ms. Ferguson denied agitation, anxiety and depression, and psychiatric examination results were normal. (Tr. 765.) Ms. Ferguson continued to report needing help with preparing meals, transportation, and managing finances, but not with taking medications, making phone calls, or other activities of daily living. (Tr. 767.) At a subsequent house call on October 4, 2016, NP Noggle's findings were similar, except that she noted "impaired cognition" on examination. (Tr. 759-63.)

At a medication management visit with NP Boyle on October 18, 2016, Ms. Ferguson reported doing well, tolerating her medications, and enjoying spending time with her eight-month-old niece. (Tr. 855.) On examination, she displayed logical thoughts, clear speech, stable mood, neutral affect, and no psychomotor abnormalities. (Tr. 856.) Her medications were continued and she was advised to follow up in three months. (*Id.*)

On November 23, 2016, Dr. Robinson made a house call, which was found appropriate because Ms. Ferguson was "deemed high risk due to recent hospital discharge and patient identified and referred by insurer due to super-utilizer status." (Tr. 753.) As with prior records, the notes indicate Ms. Ferguson was "[d]efined as unable to work, requires considerable assistance and frequent medical care," has difficulty with "cognitive impairment and taking medications." (*Id*.) The intensity and frequency of services was noted to be due to: "[t]he need to monitor multiple chronic diseases, [t]he need to monitor medication adherence, [t]he need to monitor multiple medications, [t]he patient's high risk for decompensations, [t]he patient's risk for hospitalizations and [t]he need for ongoing assessment of a vulnerable adult." (*Id.*) Ms. Ferguson denied anxiety, depression, and memory loss, and psychiatric examination results were

10

normal.  (Tr. 754-55.)  As with all prior house calls, medical services did not include treatment

relating to Ms. Ferguson's mental health.  (Tr. 755-58.)

At a December 28, 2016 house call, Dr. Robinson indicated home services were

appropriate due to "adult patient who requires another person to accompany them to doctor's

visits."  (Tr. 931.)   In addition to physical complaints, Ms. Ferguson complained of anxiety.  (Tr.

932.)  On examination, Dr. Robinson observed tachycardia, hyperactive behavior and

psychomotor slowing and agitation.  (Tr. 933-34.)  Her diagnoses included ADHD, but treatment

remained restricted to physical complaints.  (Tr. 934.)

At a January 17, 2017 medication management visit with NP Boyle, Ms. Ferguson

reported she continued to reside in a trailer on her parents' property, but her sister had moved

elsewhere.  (Tr. 857.)  She reported attending a program in East Liverpool one day per week, and

no side effects from her medications.  (*Id*.)  On examination, she was well-groomed with a

euthymic mood, full affect, relevant thoughts, clear speech, low intellectual functioning, and

intact interest and motivation.  (Tr. 858.)  Medications were continued and Ms. Ferguson was

instructed to follow up in three months.  (*Id.*)

On February 17, 2017, Nurse Practitioner Amy Myers made a house call, which was

deemed appropriate due to "behavior impairment."  (Tr. 927.)  She indicated that Ms. Ferguson

presented with PTSD, antisocial personality disorder, and an eating disorder.  (*Id*.)  On

examination, Ms. Ferguson had a flat affect, but was well-groomed with normal psychomotor

activity, orientation to person, place, and time, good eye contact, normal speech, intact memory,

normal concentration and intelligence, and intact insight and judgment.  (Tr. 929.)  NP Myers

diagnosed PTSD and ADHD, noting that Ms. Ferguson was following with NP Boyle.  (Tr. 930.)

11

On March 15, 2017, NP Myers made another house call, deemed appropriate due to "impaired cognition and morbid obesity." (Tr. 922.)  She noted that Ms. Ferguson presented with intellectual disability. (*Id.*)  Ms. Ferguson complained of anxiety and depression, but the mental status examination was in the normal range. (Tr. 923-25.)  NP Myers noted diagnoses for PTSD and major depressive disorder ("MDD"), recurrent, moderate, and recommended that Ms. Ferguson continue with psychiatry and existing medications. (Tr. 924-25.)

At an April 10, 2017 house call, again deemed appropriate due to "impaired cognition and morbid obesity," NP Myers indicated Ms. Ferguson presented with panic disorder. (Tr. 917.)  Ms. Ferguson reported symptoms of anxiety and depression. (Tr. 918.)  On examination, Ms. Ferguson was oriented to person, place, and time and presented with a normal mood and affect, but NP Myers noted "psychosis," without further elucidation. (Tr. 919.)  NP Myers continued to note diagnoses for MDD and PTSD, indicating these conditions were chronic and that Ms. Ferguson was treating with psychiatry. (Tr. 919-20.)

Ms. Ferguson saw NP Boyle for medication management on April 11, 2017, and reported that she moved out of the trailer and back into her parents' home. (Tr. 859.)  Her mood was good, her concentration was improved, and her anxiety was under control. (*Id.*)  She denied psychosis, and reported no side effects from her medications. (*Id.*)  On examination, she was well-groomed, with organized thoughts, clear speech, low intellectual functioning, stable mood, full affect, improved concentration and focus, and intact interest and motivation. (Tr. 860.)  Her diagnoses were ADHD, learning disorder, and PTSD. (*Id.*)  Her medications were continued, and follow-up was recommended in 12 weeks. (*Id.*)

At a house call on June 5, 2017, NP Myers indicated services were appropriate due to "behavior impairment and unpredictable behavior outside the home setting." (Tr. 815.)  Ms.

12

Ferguson presented with intellectual disability associated with chromosomal abnormality and mental health disorders.  (*Id*.)  Similar language to prior house call notes indicated Ms. Ferguson was "[d]efined as unable to work; cares for self; unable to carry on normal activity or do active work," with reported difficulties including: "cognitive impairment, managing finances, preparing meals, shopping, taking medications, making a phone call and transportation."  (*Id*.)  Ms. Ferguson complained of agitation, anxiety, and depression.  (Tr. 816.)  On examination, she was oriented to person, place, and time, but was noted to have "[i]mpaired cognition."  (*Id.*)  NP Myers continued to diagnose MDD, but a patient questionnaire reflected a depression score of "0 = no depression."  (Tr. 817.)  Ms. Ferguson was instructed to "continue with psych and with group."  (Tr. 818.)

On June 14, 2017, Ms. Ferguson met with QMHS Rice at PRRC, presenting as groomed and in a good mood, and expressing excitement about having moved to a new apartment down the hall from her sister.  (Tr. 1174.)  She and her sister had been cooking together, and she continued to attend center and participate in activities at church.  (*Id*.)  On June 29, 2017, QMHS Rice assisted Ms. Ferguson with forms relating to her change of address, noting again that she was "well groomed and in a good mood."  (Tr. 1180.)  She reported spending time with friends and her sister, and continuing to help at church.  (*Id*.)

At a house call on July 5, 2016, NP Myers indicated services were appropriate due to "adult patient who requires another person to accompany them to doctors' visits and behavior impairment."  (Tr. 812.)  She noted that Ms. Ferguson presented with depression, and complained of anxiety, depression, and sleep disturbance.  (Tr. 812-13.)  The only mental status findings noted by NP Myers on examination were "psychosis," depressed and anxious mood, and "impaired cognition."  (Tr. 813.)  Consistent with prior visits, NP Myers' services and

recommendations were limited to physical conditions, and Ms. Ferguson was instructed to "continue with psych, group meetings and medications" for her mental diagnoses.  (Tr. 814.)

At a July 11, 2017 medication management appointment, NP Boyle noted Ms. Ferguson had moved into her sister's apartment building.  (Tr. 862.)  Her mood was stable, and her anxiety remained under control.  (*Id*.)  She was using trazodone for sleep, and denied side effects from her medications.  (*Id*.)  On examination, Nurse Practitioner Boyle also noted she was alert and well-groomed, with relevant thoughts, clear speech, low intellectual functioning, intact interest and motivation, improved concentration and focus, and no psychosis.  (Tr. 863.)  Her medications were continued and she was instructed to follow up in twelve weeks.  (*Id.*)

At a July 31, 2017 house call, NP Myers indicated services were appropriate due to "adult patient who requires another person to accompany them to doctors' visits, behavior impairment, and morbid obesity."  (Tr. 807.)  She indicated Ms. Ferguson presented with bipolar disorder.  (*Id*.)  Ms. Ferguson complained of agitation, anxiety, and sleep disturbance. (Tr. 808.) On examination, Ms. Ferguson presented as well-groomed with normal eye contact and psychomotor activity, orientation to person, place, and time, and normal speech, but "impaired cognition."  (Tr. 809.)  Services again related to physical conditions, and Ms. Ferguson was instructed to "continue with counseling" for her mental diagnoses.  (Tr. 810.)

At an August 31, 2017 house call, NP Myers indicated services were appropriate due to "impaired cognition, morbid obesity and severe limited mobility."  (Tr. 803.)  Ms. Ferguson complained of depression and sleep disturbance.  (Tr. 804.)  On examination, she was oriented to person, place, and time, with a normal mood and affect, but "psychosis" and "impaired cognition" were noted.  (Tr. 805.)  Treatment remained limited to physical conditions.  (*Id*.)

14

At an October 10, 2017 medication management appointment, NP Boyle noted that Ms. Ferguson was doing well and sleeping without problems, and that her mother was applying for guardianship. (Tr. 865.) On examination, Ms. Ferguson was alert and well-groomed, with logical thoughts, clear speech, low intellectual functioning, stable mood, full affect, anxiety under control, intact interest and motivation, good energy, and no psychosis. (Tr. 866.) Medications were continued and she was instructed to follow up in twelve weeks. (*Id.*)

At an October 12, 2017 house call, NP Myers indicated home services were appropriate because Ms. Ferguson was an "adult patient who requires another person to accompany them to doctors' visits, impaired cognition and requires assistance/special transportation." (Tr. 799.) Notes again indicate difficulty with "cognitive impairment, managing finances, preparing meals, shopping, and transportation." (*Id.*) Ms. Ferguson complained of anxiety and depression. (Tr. 800.) The only mental status findings on examination were anxious mood and "impaired cognition." (*Id.*) Treatment remained focused on physical conditions, with a note to "continue with group" and "monitor for abnormal outbursts" in connection with depression. (Tr. 801.)

On December 15, 2017, Ms. Ferguson established care with Abhay Sharma, M.D. for primary care services. (Tr. 780.) On neurological examination, Ms. Ferguson displayed normal consciousness, orientation, and memory. (Tr. 782.) Dr. Sharma diagnosed depression and insomnia, and noted Ms. Ferguson followed with a psychiatrist and was well controlled on medications. (Tr. 782-783.)

On January 9, 2018, Ms. Ferguson saw NP Boyle for medication management. (Tr. 989.) NP Boyle noted that she was living in an apartment, in the same building with her sister and brother. (*Id.*) Her mood was stable, and her concentration and focus were improved. (*Id.*) On examination, she was alert and well-groomed, with organized thoughts, clear speech, low

intellectual functioning, euthymic mood, full affect, anxiety under control, intact interest and motivation, good energy, sleeping well, and no psychosis.  (*Id*.)  Her medications were continued and she was instructed to follow up in twelve weeks.  (Tr. 990.)

On March 14, 2018, Jennifer Brookes, QMHS made a CPST home visit to monitor symptoms and assist with managing basic needs.  (Tr. 1223.)  Her purpose was to assist Ms. Ferguson in completing Medicaid paperwork.  (*Id*.)  She observed that Ms. Ferguson played with her phone through most of the appointment, and threw her phone on the couch when asked to put away her phone or schedule a new appointment.  (*Id*.)  She also observed that Ms. Ferguson yelled at her mother on the phone when it was suggested that she use a service for transportation to an upcoming appointment to avoid relying on her mother as much.  (*Id*.)  QMHS Brookes intervened, and helped both discuss options to relieve the pressure on her mother.  (*Id*.)

In an undated letter from PRRC Program Manager Erica Como, which accompanied a signed release dated March 22, 2018 (Tr. 875-76), Ms. Como stated Ms. Ferguson had been attending a "peer support day program for people with severe and persistent mental illness/addiction" five days a week for over two years (Tr. 874).  Ms. Ferguson's reported activities at the PRRC included "mental illness education, wellness classes, medication information, safety groups, coping skills, physical wellness, living skills, nutrition, spirituality, arts and crafts, cooking lessons and a wide variety of social activities."  (Tr. 874.)  She also participated in "NAMI connections, which is a peer support group for people living with mental illness."  (*Id.*)  Ms. Como noted that Ms. Ferguson had "facilitated some of the cooking lessons and is one of our most active members." (*Id.*)

At a May 1, 2018 medication management appointment, NP Boyle noted Ms. Ferguson had been attending the YMCA for activity and had an upcoming disability hearing on May 8,

2018.  (Tr. 995.)  On examination, Ms. Ferguson was alert and well-groomed, with logical thoughts, clear speech, intellectual disability, neutral mood, restricted affect, anxiety under control, fair interest and motivation, adequate sleep, and no psychosis.  (*Id.*)  Medications were continued and Ms. Ferguson was instructed to follow up in twelve weeks.  (Tr. 995-96.)

On June 14, 2018, QMHS Brookes met with Ms. Ferguson at the PRRC to provide therapeutic behavioral services ("TBS") and help her complete health forms.  (Tr. 1250.)  QMHS Brookes noted that Ms. Ferguson "seems to be having some mood issues," and was "being very rude lately" to both her and other people at the PRRC.  (*Id.*)  "She was stomping through the building when [QMHS Brookes] arrived as [QMHS Brookes] was 15 minutes late."  (*Id.*)  When told that she could request a new [provider], Ms. Ferguson stated that she had been, "becoming mean toward people for no reason."  (*Id.*)  For context, it is noted that the initial ALJ decision denying Ms. Ferguson's request for benefits was issued on June 8, 2018.  (Tr. 169.)

Ms. Ferguson met with QMHS Brookes for TBS at the PRRC on June 21, 2018.  (Tr. 1252.)  She expressed frustration at the denial of her application for disability benefits, and agreed to consider a referral to a vocational program, but did not think she could hold down a job.  (*Id.*)  QMHS Brookes encouraged her to work on her apartment after being told by management that she needed to clean it up.  (*Id.*)  QMHS Brookes also noted that Ms. Ferguson "blame[d] The Recovery Center for he[r] being denied SSI due to comments they wrote in a letter to [t]he judge ex[pl]aining her cooking skills."  (*Id.*)

Ms. Ferguson met with QMHS Brookes for TBS at the PRRC on June 28, 2018.  (Tr. 1254.)  She observed that Ms. Ferguson was angry at a peer, walked around with her until Ms. Ferguson could calm herself, and notified staff to keep an eye on her.  (*Id.*)  She met with QMHS Brookes again at the PRRC on July 27, 2018, and QMHS Brookes observed her to be very angry

17

at everyone around her, with a "very poor" attitude.  (Tr. 1256.)  Ms. Ferguson was frustrated

with her attorney and blamed the PRRC for her denial of benefits because they submitted a letter

reporting she could cook.  (*Id*.)  QMHS Brookes advised Ms. Ferguson to see a therapist, but Ms.

Ferguson said she didn't need therapy and ended the appointment early.  (*Id*.)  At her next TBS

visit at the PRRC on July 31, 2018, QMHS Brookes noted Ms. Ferguson reported "her meds

were adjusted and she is feeling much better," although she got upset while taking about missing

her sister.  (Tr. 1258.)

    NP Boyle saw Ms. Ferguson for a medication management appointment on July 31,

2018.  (Tr. 998.)  Ms. Ferguson was still living in her apartment and attending the Peer Support

Program, and felt the program was beneficial.  (*Id.*)  On examination, she was alert, neat, and

clean, with organized thoughts, clear and non-pressured speech, intellectual disability, stable

mood, restricted affect, intact interest and motivation, and no psychosis.  (*Id*.)  Her medications

were continued and she was advised to follow up in three months.  (Tr. 998-99.)

    At a TBS home visit on August 8, 2018, QMHS Brookes observed that Ms. Ferguson's

apartment was very cluttered.  (Tr. 1260.)  Ms. Ferguson said she was "too busy to keep it

clean," and reported attending the Resource Center every weekday.  (*Id.*)  QMHS Brookes again

discussed referring Ms. Ferguson to CCMHC's vocational program, but she declined because she

believed she was too nervous to work and wanted to stay at the PRRC.  (*Id*.)

    QMHS Brookes next met with Ms. Ferguson for TBS at the PRRC on August 14, 2018,

where she was playing math games on the computer and socializing with her brother.  (Tr. 1262.)

Ms. Ferguson was waiting on her SSI appeal and was not interested in a vocational referral, but

continued to attend Recovery Center and activities relating to Recovery.  (*Id*.)  QMHS Brookes

encouraged Ms. Ferguson to return to individual therapy.  (*Id*.)  QMHS Brookes next met with

Ms. Ferguson for a home visit on August 27, 2018, where she assisted her with filling out an application for work at a local restaurant.  (Tr. 1264.)  At a home visit on September 12, 2018, Ms. Ferguson reported she was "frustrated with not having any income," and QMHS Brookes again encouraged her to look for part-time work and explained CCMHC's vocational program. (Tr. 1266.)

Ms. Ferguson attended medication management visits with NP Boyle on October 30, 2018 and January 29, 2019.  (Tr. 1001, 1004.)  At both visits, she presented as alert, neat, and clean, with normal, organized thoughts and clear speech, intellectual disability, stable and euthymic mood, normal range of affect, intact interest and motivation, adequate energy, and no psychosis.  (*Id*.)  Both times, her medications were continued and she was advised to return in three months.  (Tr. 1001-02, 1004-05.)

On November 1, 2018, QMHS Brookes met Ms. Ferguson for TBS at the PRRC.  (Tr. 1276.)  A few days prior, Ms. Ferguson had received a letter informing her that she would lose her food stamps if she did not attend work, which made her very upset, because her sister and brother did not have a work requirement.  (*Id*.)  She became sarcastic with QMHS Brookes, who again advised her that she could request a different case manager, and provided her supervisor's phone number.  (*Id*.)  QMHS Brookes then met Ms. Ferguson at her home on November 5, 2018, seeking to "reconnect … after our last meeting went poorly."  (Tr. 1278.)  Ms. Ferguson remained angry about the work requirement, but apologized for her "negative behavior" the prior week because she understood the situation was not QMHS Brookes' fault.  (*Id*.)

At a February 8, 2019 home visit, QMHS Brookes noted that Ms. Ferguson was working off her food stamps at The Way Station, and needed to clean her apartment, as she had "garbage strung throughout."  (Tr. 1282.)  Garbage remained in her apartment when QMHS Brookes

19

returned for a home visit the following week, and Ms. Ferguson explained she was "too lazy" to do it. (Tr. 1284.)  QMHS Brookes reminded her that she could be written up again if the building manager saw the condition of her apartment.  (*Id.*)  At home visits on February 21, 2019, and March 13, 2019, Ms. Ferguson told QMHS Brookes she was working off her food stamps at The Way Station and continuing to attend the PRRC.  (Tr. 1286, 1290.)

On May 8, 2019, QMHS Brookes met Ms. Ferguson and her mother at the DJFS office because Ms. Ferguson had lost her food stamp benefits for the month as a result of not completing her required 28 hours of work.  (Tr. 1304.)  Ms. Ferguson reported that she understood the requirement, but had not done the work because she had gone out of town with her family.  (*Id.*)  QMHS Brookes provided a list of food pantries.  (*Id.*)

Two days later, QMHS Brookes met Ms. Ferguson at her home, where she sobbed as they discussed housing options after being told she could not renew her lease.  (Tr. 1306.)  Prior case management notes document long-standing issues with keeping her apartment clean, and repeated warnings that failing to do so would result in failure of the inspection required for recertification.  (Tr. 1185, 1191, 1194, 1207, 1210, 1215, 1226, 1242, 1282, 1284, 1294, 1296, 1300, 1302, 1306, 1308.)  Ms. Ferguson did not want to fight the decision, and felt it would be in her best interests just to leave.  (Tr. 1306.)  QMHS Brookes noted Ms. Ferguson had been unsuccessful in working off her food stamps because of unwillingness to go work off the stamps. (*Id.*)  She intended to move back in with her parents, who believed she needed a job.  (Tr. 1308.) On May 15, 2019, she agreed to have CCMHC provide a vocational program referral.  (*Id.*)

At a May 21, 2019 medication management visit, Ms. Ferguson reported to NP Boyle that she was being evicted from her apartment because she had not kept it clean, and planned to move in with her parents.  (Tr. 1008.)  She had interviewed to work at Subway.  (*Id.*)  On

examination, she was alert, neat, and clean, with linear and logical thoughts and clear speech, intellectual disability, euthymic mood, normal range of affect, intact interest and motivation, adequate energy, and no psychosis.  (*Id.*)  Her medications were continued, and she was instructed to follow up in three months.

NP Boyle completed a Chronic Care Management Plan for ADHD on July 3, 2019, as part of Ms. Ferguson's Job Corps application.  (Tr. 1507-08.)  In the plan, NP Boyle opined Ms. Ferguson's symptoms were stable, that she demonstrated no challenging behaviors, that her prognosis with treatment and medication was good, and that she could manage her medications independently.  (*Id.*)  She also opined that Ms. Ferguson's symptoms might worsen under increased stress, noise, increased stimuli, and things that cause distraction.  (Tr. 1508.)  As a necessary accommodation, NP Boyle advised that Job Corps should "provide for environment that promotes learning."  (*Id.*)

At a final home visit on July 15, 2019, QMHS Brookes noted that Ms. Ferguson had been accepted to the Job Corps program and was moving to Cleveland for it, which would close her case at CCMHC.  (Tr. 1320.)

## 2.    Opinion Evidence

### i.    Consultative Examinations

On August 30, 2016, Ms. Ferguson attended a psychological consultative examination with Vernon Brown, Ph.D. at the request of the Agency. (Tr. 740.)  In his September 9, 2016 report, Dr. Brown noted that he had reviewed records that included an initial psychiatric evaluation from CCMHC dated February 2, 2015, pharmacological management notes from Columbiana dated July 2015 through April 2016, and a school evaluation report from May 28, 2014.  (Tr. 741.)

Dr. Brown noted that Ms. Ferguson was 20 years old, single, unemployed, and lived at home with her siblings and parents. (Tr. 742.) She appeared younger than her actual age, and "exhibited a very childlike demeanor." (Tr. 743.) She was dropped off at the evaluation by her sister. (Tr. 741.) She left her wallet at home, and brought neither a form of identification nor a copy of her referral letter to the evaluation. (Id.) Dr. Brown noted that "Ms. Ferguson was unable to fully state the reason for the interview" at the outset, but that he was able to explain the nature and purpose of the examination and gain her consent to proceed. (Tr. 740.)

On examination, Dr. Brown observed that Ms. Ferguson had good hygiene and grooming, and clear, well-formed, goal-directed, and responsive speech, which was "100% intelligible but slow." (Tr. 743.) She demonstrated no difficulty maintaining her train of thought, but "did tend to be concrete at times." (Id.) Her attitude was mostly pleasant and cooperative, her mood was dysphoric, mostly anxious but also apprehensive, and her affect was appropriate but blunted, with reduced eye contact and "only fair" voice quality. (Id.)

Ms. Ferguson reported suffering from PTSD as a result of being abused by her mother's former boyfriend. (Tr. 742.) When Dr. Brown asked how Ms. Ferguson was getting along with people, Ms. Ferguson responded, "I'm not very open." (Tr. 744.) Dr. Brown noted:

> When asked to talk about her anger Ms. Ferguson said, "I yell a lot." She said this does not happen often but that she can remain angry one to three hours. When asked how she handles disagreements she said, "Sometimes I yell and sometimes we agree on something." She denied ever being violent.

(Tr. 744.) Ms. Ferguson also reported that she worries "frequently" about things as varied as the loss of a family member and medical needles, was bothered by crowds, and preferred to be in a quiet place. (Id.) Dr. Brown noted that Ms. Ferguson "was able to give only a marginally adequate definition" of hallucinations, but after he explained what they were, she denied visual hallucinations and reported auditory hallucinations consisting of voices talking about her and

22

calling her name.  (Tr. 744.)  Dr. Brown noted "no obvious delusions," but noted "she described intermittent paranoia and intermittent ideas of reference."  (*Id*.)

On examination, Ms. Ferguson was alert and oriented, but her ability to concentrate was somewhat impaired.  (Tr. 744-45.)  She was able to complete six steps of serial threes without error but "when asked she reported finding mental arithmetic 'a little more' difficult now than previously."  (Tr. 745.)  Dr. Brown noted "[s]he did not appear to truly comprehend the question saying that the difficulty began, 'Around 20 because I can't count on my fingers that much.'" (*Id*.)  She had good immediate recall, and appeared to be in the "low average range of intellectual functioning, but with learning disabilities."  (*Id*.)  Ms. Ferguson showed fair insight as to her personal situation, and was aware that she had emotional problems, but she had "rather poor" insight in general, as evidenced by a "marginally adequate interpretation" of an adage, and some difficulty with comparisons.  (*Id*.)  Dr. Brown assessed her judgment as "fair in general," and "superficial" but "adequate for gross safety needs."  (Tr. 746.)

Dr. Brown diagnosed: major depressive disorder, recurrent with psychotic features; specific learning disorder with impairment in mathematics; and unspecified communication disorder.  (Tr. 747.)  He opined she had the following mental functional limitations:

- Somewhat impaired ability to understand, remember and carry out instructions (Tr. 747),

- Significantly impaired ability to maintain attention and concentration in order to perform simple and complex tasks (*Id*.),

- Significantly to notably impaired ability to respond appropriately to supervisors and coworkers in a work setting (*Id*.), and

- Notably impaired ability to respond appropriately to pressures in a work setting (Tr. 748).

Finally, he opined that she lacked the ability to manage any benefits she received.  (*Id*.)

### ii.    Function Report

On July 8, 2016, Ms. Ferguson completed a function report.  (Tr. 375-82.)  She reported that her daily activities consisted of "[b]us picks me and takes me to group thing from 10am to 3pm.  Then I come home and relax then go to bed."  (Tr. 376.)  For personal care, she explained she would "wear what my Mom washes," and use hair products that her Mom bought.  (*Id*.)  She reported needing reminders to brush her teeth and take medicine.  (Tr. 377.)  She said she "sometimes" prepared her own meals, including "Hamburger helpers, Hotdogs, Mac & Cheese," and performed household chores like taking out the trash and doing the dishes, but reported needing help or encouragement to do the dishes.  (*Id*.)  She went outside every day, and used public transportation, but could not go out alone because she did not feel safe.  (Tr. 378.)  She was afraid to drive.  (*Id*.)  Her Mom helped her shop for food, and also paid her bills, and handled her money.  (*Id*.)  Her hobby was watching tv, and she reported: "I do it all the time and I'm great at it."  (Tr. 379.)  She reported watching tv was her primary social activity, but she also went to group and church.  (*Id*.)  She fought with her sister and brother.  (Tr. 380.)  When asked how long she could pay attention, she responded "not long," and when asked how well she could follow written or spoken instructions, she responded "not well."  (*Id*.)  She reported getting along with authority figures "ok," and handling stress and changes in routine "bad."  (Tr. 381.)

### iii.    Opinion of Treating Psychiatric Nurse Practitioner

On May 2, 2018, Linda Boyle, FNP-BC completed a "Residual Functional Capacity" form.  (Tr. 880-86.)  NP Boyle stated that she treated Ms. Ferguson for ADHD combined type, learning disorder, Asperger's Syndrome, and PTSD.  (Tr. 880.)  When asked to explain how Ms. Ferguson's impairments and symptoms impacted ability to work, NP Boyle stated: "She is limited in motivation and attention to activities of daily living. She is assisted by her adoptive

24

mother and her mental health case manager." (*Id*.)  On a checkbox section of the form, NP Boyle indicated Ms. Ferguson had the following symptoms: Diminished interest in almost all activities, sleep disturbance, decreased energy, difficulty concentrating or thinking, distractibility, appetite disturbance with change in weight, irritability, disproportionate fear or anxiety about at least two different situations, and disturbance in mood or behavior.  (Tr. 881-82.)  NP Boyle wrote in additional symptoms including verbal aggression and night terrors (Tr. 880), and also explained that due to autism, Ms. Ferguson was "[v]erbally restricted. Answers questions asked with brief responses. Lacks spontaneous speech." (Tr. 882).

NP Boyle opined that Ms. Ferguson had the following functional limitations:

- markedly limited in understanding, remembering, or applying information.  Nurse Practitioner Boyle explained that, due to a learning disorder, Ms. Ferguson was unable to perform activities that require concentration, and had "[p]roblems with detailed information" (Tr. 883);

- marked limitation in interacting with others.  Nurse Practitioner Boyle explained that Ms. Ferguson was socially limited and responded "slowly without detail" (*id*.);

- marked limitation in concentration, persistence, or pace.  Nurse Practitioner Boyle explained ADHD and learning disabilities impact her Ms. Ferguson's mental functioning, and that Ms. Ferguson "[w]ill struggle with simple tasks such as keeping her living space clean" (Tr. 884); and

- marked limitation in adapting and managing oneself.  Nurse Practitioner Boyle explained that Ms. Ferguson "[w]ill have problems functioning under stressful situations and is unable to set goals, though she could follow basic instructions and her hygiene and attire were appropriate" (*id*.).

NP Boyle also opined that Ms. Ferguson was capable of "minimal" low stress work, because her symptoms would increase with stressful situations and she did not adjust well to change.  (Tr. 886.)  She opined that Ms. Ferguson would be off-task over 75% of the work day, would miss more than four days of work per month, and could not stay on task to complete a normal work week.  (Tr. 885.)  NP Boyle also explained: "Client is stable and doing well at this time. Mental

[and] behavioral symptoms are under control. However, it is her learning disability, Asperger's, and social skills that also limit her ability to work." (Tr. 886.)

### iv.     State Agency Reviewers

On September 16, 2016 state agency reviewing psychologist Joseph Edwards, Ph.D., reviewed the record and opined that Ms. Ferguson had the following mental RFC limitations:

> Capable of 1-3 step tasks at a slow to moderate pace in a setting with flexible production demands.  Can interact appropriately with coworkers and supervisors, but interaction with the public should be limited to brief and superficial.  [M]ajor changes should be explained in advance and implemented gradually to allow for adjustment.

(Tr. 92.)  Dr. Edwards also opined Ms. Ferguson had moderate limitation in the following areas:

- understand, remember, and carry out detailed instructions (Tr. 91):

- maintain attention and concentration for extended periods (*Id*.);

- complete a normal workday/workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods (Tr. 92);

- interact appropriately with the general public (*Id*.); and

- respond appropriately to changes in work setting (*Id*.).

On December 12, 2016, state agency reviewing psychologist Kristen Haskins, Psy.D., reviewed the record and concurred with the opinion of Dr. Edwards.  (Tr. 123-24.)

### C.     Hearing Testimony

### 1.     Plaintiff's Testimony

At the February 6, 2020 hearing, Ms. Ferguson testified she was 23 years old, single, and lived at Job Corps, where she was getting trained for work as a nursing assistant.  (Tr. 50.)  She had a high school diploma, and had never obtained a driver's license.  (Tr. 51.)  She took the DMV practice test on the internet and failed.  (Tr. 64.)

She testified that the mental impairments preventing her from working were Asperger's and PTSD.  (Tr. 54.)  When asked how Asperger's affected her, she testified: "It puts a damper on me because I don't know what it is - - or what Asperger's is fully."  (*Id*.)  She reported going to Columbiana Counseling for "[a]s long as I could remember," and that she saw Linda Boyle "[m]ainly to get my medication."  (*Id.*)  She was able to name five medications she was taking, and specifically identified which medications she was taking for her blood pressure.  (*Id.*)  She knew she was also taking medication for depression, but did not know which medication was for depression.  (*Id*.)  With her depression, she has some good days and some bad days.  (Tr. 58.)  On sad days she doesn't want to do anything.  (*Id*.)  She also reported episodes of aggression with classmates at Job Corps two or three times a month.  (Tr. 64-65.)

She testified that she went to a Peer Recovery Group to learn about and help her deal with her mental illness, explaining that she attended daily before moving to Cleveland.  (Tr. 54-55.)  When the ALJ noted that her records indicated she had attended between one and fifteen days per month in specifically identified months, she agreed that she did not go every day, explaining: "It just - - it depends on the days and my mood."  (Tr. 56.)  On the days that she did not go, she explained "I was tired and kind of had something else come up."  (*Id.*)  When asked if she learned skills about independent living there, she answered no, and explained: "When they had a cooking class, it was mainly you watched while they cooked."  (*Id.*)  When asked if she helped to run the cooking classes, she answered: "I think that was like only once. Never did it again."  (Tr. 56-57.)

When asked if she also went to group therapy, she answered: "I did go to therapy.  It's just that I don't open up that well."  (Tr. 57.)  She could not remember how long ago it was that she went to therapy.  (*Id.*)  She testified to getting case management services which included help

with doctors' appointments, food stamps, government housing, and getting into Job Corps.  (Tr. 58.)  She also reported that her mother accompanied her to doctor's appointments because she needed help understanding what is going on with the doctor.  (Tr. 65-66.)

At the time of the hearing, she reported that most of her day was spent in Job Corps training classes, which focused on math and reading.  (Tr. 52.)  She reported that she could read, but not well, and did not understand words most of the time.  (*Id.*)  She also reported being able to add and subtract, but having trouble with fractions and division.  (Tr. 53.)  She reported that she would be at Job Corps "until I finish," which would be based on her own pace and was expected to take a year or so.  (Tr. 53.)  Ms. Ferguson reported eating her meals in the cafeteria on the Job Corps campus and being accompanied by Job Corps staff when she went shopping.  (Tr. 62.)  She explained that they would provide transportation, and sometimes help her buy things.  (*Id.*)  She had to sign up to go on shopping trips, and had to wait another week if the trip was already full.  (*Id.*)  She reported that Job Corps held her medications and she had to sign in to take them.  (Tr. 64.)  She reported that she was not currently meeting her Job Corps requirements.  (Tr. 63.)

Prior to going to Job Corps, she reported some work sorting and pricing clothes to receive food stamps, but said she couldn't stay concentrated and her hands kept getting fidgety.  (Tr. 59-60.)  Once or twice a day, she reported her supervisor would come and correct her work.  (Tr. 60.)  Before that, she reported some part time work making pizzas at Papa John's.  (*Id.*)  She testified that she could not work as fast as they wanted her to, and could not remember what toppings went on each pizza, and so she had to redo them.  (Tr. 61.)  She said the supervisor would try to help her, but that she was fired because she could not work fast enough.  (*Id.*)

### 2.    Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing.  (Tr. 66.)  For her first hypothetical, the ALJ asked the VE to assume an individual of Ms. Ferguson's age and education and with her past work, with the following functional limitations:

> [C]apable of performing work at all exertional levels as defined in the regulations.
>
> Work should not require exposure to hazards such as dangerous, moving machinery or unprotected heights.  Work should be limited to tasks and occupations that have an SVP of two or lower, performed in a low stress setting which is defined as having no fast paced production requirements such as fast paced assembly line work, or high volume piecemeal quotas.
>
> No greater than occasional changes in work routine or work setting, and which requires little independent decision making or goal setting.

(Tr. 67.)  The VE testified that the hypothetical individual could perform representative positions in the national economy, including kitchen helper, office cleaner, or marker.  (Tr. 68.)

The ALJ amended the hypothetical to add the limitation that work should not require interaction with the general public.  (Tr. 68.)  The VE testified the jobs he identified would still be available.  (Tr. 69.)

The ALJ then added a limitation that work should not require greater than occasional interaction with co-workers or supervisors once the job is learned and duties are assigned.  (Tr. 69.)  The VE testified the jobs he identified would still be available.  (*Id*.)

The VE also testified that if an employee was off task 10% or more of the time, that would completely eliminate competitive work at any level, including the jobs he identified.  (*Id*.)  If an employee was absent two or more days a month, he believed the supervisor would intervene to try to correct that, but it would result in termination if the intervention failed.  (*Id*.)  The VE also explained that about 70% of kitchen helper positions and 50% of office cleaner and marker positions would be available before 10:00 am or after 3:00 pm.  (Tr. 70-71.)

In response to questions from Ms. Ferguson's counsel, the VE testified that he believed a worker who needed supervisory support once or twice a month to remember how to do the job could maintain employment, but a worker who needed a half-hour of daily over-the-shoulder support from a supervisor after the learning period could not maintain employment.  (Tr. 76.)

### III.   Standard for Disability

Under the Social Security Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.  If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work. If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520;[1]  *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform other work available in the national economy.  *Id.*

## IV.  The ALJ's Decision

In her March 5, 2020 decision, the ALJ made the following findings:[2]

1.      The claimant had not attained the age of 22 as of November 13, 2015, the alleged onset date.  (Tr. 18.)

2.      The claimant has not engaged in substantial gainful activity since November 13, 2015, the alleged onset date.  (Tr. 19.)

3.      The claimant has the following severe impairments: a learning disability and communication disorder; major depression with psychotic features; a learning disability not otherwise specified; attention deficit hyperactivity disorder (ADHD); and posttraumatic stress disorder (PTSD).  (*Id.*)

---

[1] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, in most instances, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501, et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 *et seq.*, corresponding to the last two digits of the DIB cite (*i.e.*, 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

[2] The ALJ's findings are summarized.

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 20.)

5.      The claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: the claimant's work should not require exposure to hazards, such as dangerous moving machinery or unprotected heights; the claimant's work should be limited to tasks and occupations that have a SVP of 2 or lower and performed in a low stress setting, which is defined as one having no fast-paced production requirements, such as fast-paced assembly line work or high volume piecemeal quotas; the claimant can have no greater than occasional changes in work routine or work setting, and which requires little independent decision making or goal setting; the claimant's work should not require interaction with the general public as a requirement of the job; and the claimant's work should not require greater than occasional interaction with co-workers or supervisors once the job is learned and duties are assigned.  (Tr. 24.)

6.      The claimant has no past relevant work.  (Tr. 31.)

7.      The claimant was born in 1996 and was 19 years old, defined as a younger individual age 18-49, on the alleged disability onset date.  (*Id.*)

8.      The claimant has at least a high school education and is able to communicate in English.  (Tr. 32.)

9.      Transferability of job skills is not material to the determination of disability.  (*Id.*)

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform, including kitchen helper, office cleaner, and marker.  (*Id.*)

Based on the foregoing, the ALJ determined that Ms. Ferguson had not been under a disability, as defined in the Social Security Act, from November 13, 2015, through the date of the decision on March 5, 2020.  (Tr. 33.)

32

### V.    Plaintiff's Arguments

In her brief, Ms. Ferguson raises a single legal issue:

1.  After Step Three and prior to Step Four, the ALJ assessed a mental RFC finding that is unsupported substantial evidence due to erroneous consideration of the opinion evidence and failure to develop the record in accordance with precedent.  (ECF Doc. 16 p. 3.)

### VI.    Law & Analysis

**A.    Standard of Review**

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)); *see also Blakley*, 581 F.3d at 406.  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

"'The substantial-evidence standard ... presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'"  *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).  Therefore, a court

"may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003); *Blakley*, 581 F.3d at 406 ("[I]f substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'") (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Even where an ALJ decision is supported by substantial evidence, the Sixth Circuit explains the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007); citing *Wilson v. Comm'r of Soc. Sec.* 378 F.3d 541, 546-547 (6th Cir. 2004)); *see also Rabbers*, 582 F.3d at 654 ("Generally, … we review decisions of administrative agencies for harmless error.").  A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.      Assignment of Error: Whether Mental RFC was Supported by Substantial Evidence**

Ms. Ferguson asserts the ALJ erred by failing to support her mental RFC determination with substantial evidence.  (ECF Doc. 16 p. 13.)  Specifically, she argues the ALJ failed to sufficiently explain her decision to afford great weight to the medical opinions of the state agency psychological consultants and assign little weight to the opinion of the psychological

consultative examiner.  (*Id*.)  She argues that these errors in weighing the opinion evidence

constituted harmful error because a finding favoring the consultative examiner's opinion over

those of the state agency consultants "would most likely result in an RFC that is disabling

pursuant to SSR 85-15."  (*Id*. at p. 19.)  In the alternative, she argues that the ALJ should have

ordered a new consultative examination.  (*Id.* at p. 20.)

The Commissioner responds that substantial evidence supported the ALJ's findings at

each step of the sequential analysis, and argues the decision is well-articulated, as the ALJ

"described, in detail, why she assigned great weight to the reviewing psychologists' opinions,

little weight to the examiner's opinion, and little weight to Nurse Boyle's opinions, in

accordance with 20 C.F.R. § 404.1527."  (ECF Doc. 19 pp. 8-9, 14.)

### 1.      Whether ALJ Appropriately Weighed Medical Opinion Evidence

Because Ms. Ferguson filed her claim before May 27, 2017, the rules for evaluation of

opinion evidence at that time are applicable here.  Those Social Security regulations established

a hierarchy for evaluating medical source opinions in which the well-supported opinion of a

treating physician is entitled to controlling weight, *see* 20 C.F.R. § 404.1527(c)(2), and the

opinion of an examining but non-treating medical source is given more weight than the opinion

of a non-examining medical source, *see* 20 C.F.R. § 404.1527(c)(1).  "In evaluating the opinion

of an examining but nontreating physician, 'the ALJ should consider factors including the length

and nature of the treatment relationship, the evidence that the physician offered in support of her

opinion, how consistent the opinion is with the record as a whole, and whether the physician was

practicing in her specialty.'"  *Beery v. Comm'r of Soc. Sec.*, 819 F. App'x 405, 408 (6th Cir.

2020) (quoting *Ealy v. Comm'r of Soc. Sec.,* 594 F.3d 504, 514 (6th Cir. 2010) (citing 20 C.F.R.

§ 404.1527(d))).  In cases where there is no treating source opinion, an ALJ must "evaluate all

medical opinions" using the factors set forth in 20 C.F.R. § 416.927(c), including: length of

treatment history; consistency of the opinion with other evidence; supportability; and specialty or

expertise in the medical field related to the individual's impairments.  *Walton v. Comm'r of Soc.*

*Sec.*, No. 97–2030, 1999 WL 506979, at *2 (6th Cir. June 7, 1999).

### i.     Whether ALJ Erred in Assigning Little Weight to Opinion of Psychological Consultative Examiner

Ms. Ferguson attended a psychological consultative examination with Vernon Brown,

Ph.D. on August 30, 2016.  (Tr. 740-748.)  In his report, Dr. Brown noted that he reviewed

records prior to the evaluation, including: an initial psychiatric evaluation from CCMHC dated

February 2, 2015; pharmacologic management notes from CCMHC dated July 2015 through

April 2016; and a school evaluation report from May 28, 2014.  (Tr. 741.)

In her decision, the ALJ discussed and weighed Dr. Brown's opinion as follows:

> [L]ittle weight is given to the opinion of Dr. Brown, dated September 2016.
> (Exhibit 10F). Dr. Brown opined that the claimant's ability to maintain attention
> and concentration in order to perform simple and complex tasks is significantly
> impaired. He also indicated that the claimant's ability to respond appropriately to
> supervisors and co-workers in a work setting is significantly to notably impaired.
> Further, Dr. Brown stated that the claimant's ability to maintain attention and
> concentration in order to perform simple and complex tasks is significantly
> impaired. (Exhibit 10F, pg. 9). <u>Little weight is given to the opinion of Dr. Brown
> as it is neither well supported nor consistent with the medical records and mental
> status examinations</u> demonstrating symptoms of a cognitive impairment,
> depression, and poor self esteem, but normal behavior, alertness, orientation times
> three, pleasantness, a bright affect, a normal mood, cooperativeness, clear and goal
> directed speech, normal memory, improved focus and concentration, the ability to
> complete six steps of serial threes without error, good immediate recall ability, and
> organized thoughts. (Exhibits 10F, pgs. 5, 6, 7, & 9, 11F, pg. 4, 15F, pg. 1, 18F,
> pgs. 11, 12, 13, 58, & 59, and 22F, pg. 43). <u>Little weight is also given to Dr.
> Brown's opinion because it appears to be largely based on the claimant's subjective
> report of symptoms</u>.

(Tr. 28 (emphasis added).)  Thus, the ALJ provided two general grounds for her decision to afford

little weight to the examining opinion: (1) it was not well supported by Dr. Brown's own findings

and "appears to be largely based on … subjective reports of symptoms" ("supportability"); (2) it

was not consistent with medical records and mental status examinations ("consistency").

### a.    ALJ Analysis of Supportability

With respect to "supportability," the governing regulations provide:

> The more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion. The better an explanation a source provides for a medical opinion, the more weight we will give that medical opinion.

20 C.F.R. § 404.1527(c)(3).  In concluding that Dr. Brown's opinion was not "well supported"

by his own findings, the ALJ cited generally to the mental status examination results in Dr.

Brown's report.  (*Id.* (citing Tr. 743-45, 747).)  Although she did not specifically discuss those

findings in her analysis of his opinion, she had previously outlined the findings as follows:

> On mental status examination, the claimant was alert, oriented times three, pleasant, and cooperative. She also had clear, well formed, goal directed, and responsive speech.  Additionally, the claimant's speech was slow, but 100 percent intelligible. She denied having any panic or anxiety attacks. While the claimant was anxious and worried with a dysphoric mood and a blunted affect, she denied ever experiencing any suicidal or homicidal ideations. She had somewhat impaired concentration, but was able to complete six steps of serial threes without error, had good immediate recall ability, and had low average intellectual functioning. Diagnoses were noted as major depressive disorder, recurrent with psychotic features; a specific learning disorder with an impairment in mathematics; and an unspecified communication disorder.

(Tr. 26 (citing 743-45, 747).)  As a general matter, this recitation of objective findings is an

accurate description of the relevant mental status examination findings.

However, there are additional observations and findings set forth in Dr. Brown's report

that were not specifically mentioned by the ALJ, including that Ms. Ferguson: (1) was unable to

fully state the reason for the consultative examination upon her arrival (Tr. 740); (2) was unable

to say whether or not she had any involvement with vocational rehabilitation programs (Tr. 742);

(3) appeared younger than her age and exhibited a "very childlike demeanor" (Tr. 743); (4) had

37

reduced eye contact (*id.*); (5) gave only a marginally adequate definition of what hallucinations were and, after the meaning was clarified, described auditory hallucinations with unidentified voices talking about her and calling her name (Tr. 744); (6) displayed "rather poor" insight in general, but fair insight regarding her personal situation and condition (Tr. 745); (7) displayed fair judgment that was "adequate for her gross safety needs," but required prompting to answer relevant hypotheticals (Tr. 746); and (8) when describing the her only past job, was unable to say when she held it, how long she held it, or why she was let go (*id.*).

It is well established that an ALJ need not identify or discuss every medical finding in support of her conclusions.  *See, e.g., Kornecky v. Comm'r,* 167 F. App'x 496, 508 (6th Cir. 2006) ("An ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (quoting *Loral Defense Systems–Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999)).  Nevertheless, it is notable that the findings not discussed by the ALJ are suggestive of an individual with "very childlike" demeanor, limited understanding of matters that included her own work history and the purpose of the consultative examination, "rather poor" insight beyond her own personal situation, and judgment that was adequate for "gross safety" but with prompting needed to respond to hypotheticals.  The findings are clearly relevant to Dr. Brown's opinions that Ms. Ferguson was "significantly impaired" in maintaining attention and concentration, "significantly to notably impaired" in interacting with supervisors and coworkers, "notably impaired" in responding to work pressures, and unable to manage her own benefits.  (Tr. 747-48.)

In addition to failing to note the observations / findings specified above, the ALJ also failed to acknowledge Dr. Brown's review of medical records that included Ms. Ferguson's psychiatric examination and pharmacologic management notes from February 2015 through

38

April of 2016, and school evaluation team report from 2014. (Tr. 741.) While it is not generally required that an ALJ identify all information considered in support of a medical opinion, her failure to acknowledge Dr. Brown's review of underlying medical records is particularly notable in light of her explicit finding that Dr. Brown's opinion "appears to be largely based on the claimant's subjective report of symptoms." (Tr. 28.)

Moreover, in discounting Dr. Brown's opinion as largely based on subjective report, the ALJ did not specify what subjective reports were improperly relied upon. The Commissioner notes that Dr. Brown's opinion that Ms. Ferguson was significantly impaired in maintaining attention and concentration referenced a report that "[s]he cooks only simple things and she does not manage her own affairs," and that his opinion she was significantly to notably impaired in responding to supervisors and coworkers referenced a report that "[s]he was let go from her only job" and "was unable to say why." (ECF Doc. 19 p. 12 (quoting Tr. 747).) Dr. Brown elucidated further on Ms. Ferguson's self-report regarding her work history, as follows:

> Ms. Ferguson described an extremely limited work history. She has only held one job. She was working in a pizza parlor. She was unable to say how long she had worked there or when her employment ended. The referral information indicated that they had stopped scheduling her. She was unable to explain why saying, "They let me go for some reason."

(Tr. 742.) Other subjective reports noted by Dr. Brown included that Ms. Ferguson: felt fine and was sad "only sometimes" (Tr. 743); was "not very open" with other people (Tr. 744); worried frequently and was stressed, but denied anxiety or panic attacks (*id.*); was bothered "a little" by crowds (*id.*); "yell[ed] a lot" when angry, but it did not happen often (*id.*); and reported hearing voices talking about her and calling her name (*id.*).

A review of the record indicates that the subjective reports noted by Dr. Brown, as set forth above, were largely consistent with the body of treatment records in the case. The evidence highlighted in both parties' briefs suggests that Ms. Ferguson: cooked simple things and helped

with cooking lessons at PRRC, but relied on assistance or monitoring when cooking (*see, e.g.,* Tr. 377, 746, 773, 874, 1035, 1066, 1174); was assisted by her parents and case manager in managing her affairs (*see, e.g.,* Tr. 376-77, 676, 1078, 1191, 1194, 1210, 1224, 1294); held only one limited part time job at a pizza parlor, and was let go from that job (*see, e.g.,* Tr. 588-89, 854, 1052, 1054, 1056, 1058,1078); and sometimes struggled with anxiety and/or anger (*see, e.g.,* Tr. 1223, 1237, 1240, 1250, 1254, 1256, 1258, 1276).  The ALJ herself cited to the self-reported activities of daily living set forth in Dr. Brown's report as evidence of Ms. Ferguson's functioning.  (Tr. 23, 25, 31 (citing Tr. 746).)  The only clear factual dispute is whether the record bore out Ms. Ferguson's report of some auditory hallucinations.  (*See* ECF Doc. 16 p. 19; ECF Doc. 19 pp. 12-13.)

Taken as a whole, the ALJ's analysis of the supportability of Dr. Brown's opinion does not adequately support her decision to afford "little weight" to that opinion.  In finding the opinion was not "well supported" by objective findings, she neglected to address observations and findings which suggested childlike behavior and limitations in understanding and insight. Further, despite stating the opinion was "largely based on … subjective reports of symptoms," the ALJ did not acknowledge that Dr. Brown's examination had included the review of Ms. Ferguson's medical and school records.  And finally, in discounting Dr. Brown's consideration of information subjectively reported by Ms. Ferguson, the ALJ failed to clearly explain how consideration of those reports undermined the reliability of his opinion when most of the reports were borne out by the record as a whole, and are not the subject of any present factual dispute.

### b.    ALJ Analysis of "Consistency"

With respect to "consistency," the regulations provide: "Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical

opinion." 20 C.F.R. § 404.1527(c)(4).  In finding Dr. Brown's opinion was not consistent with treatment records and mental status examinations, the ALJ cited to the following records:

- July 29, 2016 house call note by NP Noggle, indicating services were appropriate due to "behavior impairment," noting difficulty with "cognitive impairment" but no reported psychiatric symptoms and a normal psychiatric exam, with treatment limited to physical conditions (Tr. 946-947);

- October 28, 2016 mental status report by NP Boyle stating Ms. Ferguson was alert and oriented x3, with bright affect and euthymic mood, and was diagnosed with ADHD, Learning Disorder NOS, and PTSD (Tr. 752);

- August 31, 2017 house call note by NP Myers noting reported symptoms of depression and sleep disturbance, with examination findings including psychosis, oriented to person, place and time, with normal mood and affect, and impaired cognition, and diagnoses of major depressive disorder and PTSD, but with treatment limited to physical conditions (Tr. 899-901);

- January 9, 2018 mental status examination by NP Boyle, noting Ms. Ferguson was alert and well-groomed, with organized thoughts, clear speech, low intellectual functioning, euthymic mood, full affect, anxiety "under control," intact interest and mood, and good energy (Tr. 871); and

- December 19, 2019 note from a primary care office visit with Dr. Sharma, noting no reported psychiatric symptoms and had neurological examination findings like memory, orientation, and consciousness, but with diagnoses and treatment limited to physical medical conditions (Tr. 1431-1433).

Ms. Ferguson argues that these selected medical findings ignore evidence that does not support the ALJ's decisions, and specifically do not address evidence indicating "that when confronted with stressors, [Ms. Ferguson] reacted poorly with combative and/or rude behavior." (ECF Doc. 16 p. 16.)  She also asserts the ALJ failed to engage in a meaningful discussion of examination results showing "impaired cognition and somewhat impaired concentration." (*Id*. at p. 17.)

With respect to the ALJ's citation to two largely normal mental status examinations by Ms. Ferguson's psychiatric provider NP Boyle, a review of the records in this case reflects that these findings are generally consistent with the mental status findings noted by NP Boyle throughout the relevant period. (*See, e.g.,* Tr. 586, 589, 856, 858, 860, 863, 866.)  Similarly, the

mental status findings and office notes of NP Noggle and NP Myers during house calls in 2016 and 2017 are generally consistent with the mental status findings made of Visiting Physicians Association providers throughout the record, with some general references to "impaired cognition" and "psychosis" on examination, but with no more specific findings on examination and with no treatment provided for mental health conditions. [3]  (*See, e.g.,* Tr. 764-65, 769-70, 901, 905, 914, 924, 941, 944, 947.)  Thus, as a general matter, the ALJ's characterization of the "mental status examinations" in the records is largely consistent with the findings set forth in those records, and supported by substantial evidence.

While the ALJ did accurately characterize the "mental status examinations" of record in finding Dr. Brown's opinion was not consistent with "the medical records <u>and</u> mental status examinations" (Tr. 28 (emphasis added)), she did not explicitly discuss other notable elements of the medical records.  For example, the ALJ acknowledged that Ms. Ferguson attended programing at the PRRC with some frequency, although less than the five-days-per-week initially reported by Ms. Ferguson.  (Tr. 15 n.1; Tr. 23, 26.)  However, she did not specifically acknowledge that the relevant program was "a confidential peer support day program for people with severe and persistent mental illness/addiction."  (Tr. 874.)

The ALJ also failed to address records showing Ms. Ferguson was receiving frequent case management assistance in the form of CPST and TBS, sometimes on a weekly basis, including assistance with applications for services, managing social interactions and mood issues, and maintaining her living space.  (*See, e.g.,* 718, 770, 1035, 1037, 1046-66, 1185, 1191,

_____

[3] The ALJ provided an extensive discussion of recurring language in Visiting Physicians Association records regarding disability and reported requirements for special assistance, noting inconsistencies in those records and giving no weight to any statements regarding disability, as well as finding specified ratings to be of little probative value.  (Tr. 29-31.)  Those findings are not challenged in these proceedings, and will not be further addressed herein.

1194, 1207, 1210, 1215, 1223, 1250-66, 1276-1309.)  As noted by Ms. Ferguson, a review of the case management notes reflects that Ms. Ferguson sometimes struggled with her mood and interactions with others (*see, e.g.*, Tr. 1223, 1237, 1240, 1250, 1254, 1256, 1258, 1276), was reliant on help in managing certain activities of daily living (*see, e.g.,* Tr. 1035, 1037, 1052, 1078, 1191, 1194, 1210, 1294), and struggled so significantly with maintaining the cleanliness of her living space that she lost her apartment (*see, e.g.,* Tr. 1185, 1191, 1194, 1207, 1210, 1215, 1226, 1242, 1260, 1282, 1284, 1288, 1294, 1296, 1300, 1302, 1306, 1309).

While the ALJ's citation to mental status examination findings to support her analysis as to the "consistency" of Dr. Brown's opinion with the record was appropriate, her failure to also acknowledge medical evidence of record that was more supportive of Dr. Brown's opinion, including her significant use of psychiatric supports that included case management and a peer support day program, undermined the accuracy and logic of her ultimate decision to afford little weight to Dr. Brown's medical opinions.

The Sixth Circuit has explained that remand is required "where an ALJ selectively includes only those portions of the medical evidence that places a claimant in a capable light and fails to acknowledge evidence that potentially supports a finding of disability."  *Anderson v. Comm'r of Soc. Sec.*, No. 3:20-CV-02728, 2022 WL 279856, at *11 (N.D. Ohio Jan. 31, 2022) (citing *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014)); *Germany–Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports").  Considering all of the issues noted in the "supportability" and "consistency" analyses  above – including the ALJ's failure to acknowledge additional observations and findings in Dr. Brown's report that supported his opinions, her failure to recognize that Dr. Brown also relied on a review of underlying medical and school

43

records in reaching his opinions, her discounting of Dr. Brown's reliance on subjective reports without identifying what, if any, of those reports were inconsistent with the medical records, and her failure to address Ms. Ferguson's reliance on psychiatric supports that included frequent participation in case management and a mental health day program – the undersigned finds that the combination of excluded information and deficient explanation result in a failure to "build an accurate and logical bridge between the evidence and the result." *Fleischer*, 774 F. Supp. 2d at 877.  While any one of the identified failings may not have been fatal to the ALJ's weighing of Dr. Brown's examining opinion, the combination necessitates a finding that the ALJ failed to fully and adequately support her determination that Dr. Brown's examining medical opinion was entitled to "little weight."

For the reasons stated above, the undersigned recommends that the matter be remanded so that the ALJ can assess the relevant evidence and provide a clear, accurate, and complete explanation for the weight assigned to Dr. Brown's opinion.

> ii.    **Whether ALJ Erred in Assigning Great Weight to State Agency Reviewing Psychological Opinions**

State agency psychological consultants Joseph Edwards, Ph.D., and Kristen Haskins, Psy.D. reviewed the record and offered opinions regarding Ms. Ferguson's mental RFC at the initial and reconsideration level of review.  (Tr. 90-91, 122- 23.)  In her decision, the ALJ addressed the opinions of the state agency psychological consultants' opinions as follows:

> [G]reat weight is given to the opinions of State agency psychological consultants Joseph Edwards, Ph.D., and Kristen Haskins, Psy.D. (Exhibits 1A, 2A, 5A, and 6A). Dr. Edwards and Dr. Haskins opined in September 2016 and December 2016 that while the claimant is moderately limited in her ability to understand, remember, and carry out detailed instructions, she is not significantly limited in her ability to understand, remember, and carry out very short and simple instructions. They also noted that the claimant has social interaction and adaptation limitations. Moreover, Dr. Edwards and Dr. Haskins stated that the claimant's affective disorders, learning disorder, and ADD/ADHD impairments are severe. (Exhibits 1A, 2A, 5A, and 6A). Great weight is given to the opinions of Dr. Edwards and Dr. Haskins <u>as they are</u>

well supported, consistent with the limitations noted in the record, and consistent with the medical records, which showed impaired cognition and somewhat impaired concentration, as well as complaints of agitation, depression, and anxiety, but clear speech, alertness, orientation times three, a normal affect, appropriate emotional responses, normal behavior, a stable mood, normal psychomotor activity, good eye contact, reality based thoughts, adequate concentration, good immediate recall ability, and no psychosis, homicidal ideation, or suicidal ideation. (Exhibits 4F, pg. 58, 7F, pgs. 3-5, 10F, pgs. 5, 6, 7, & 9, 13F, pg. 41, and 15F, pg. 1). Further, great weight is given to the opinions of the State agency psychological consultants because they are familiar with, and have knowledge of, the criteria used to determine disability under the Social Security Act, and they are familiar with the claimant's record.

(Tr. 27 (emphasis added).)  The state agency reviewers had the opportunity to consider Dr. Brown's examination findings in rendering their opinions, and found his opinions "inconsistent with reported findings in exam." (Tr. 90-91, 123.)

A few things should be noted in light of the finding in Section VI.B.1.i., *supra*, that the ALJ erred with regard to the weight given to Dr. Brown's examining opinion.  First, the applicable regulations provide: "Generally, we give more weight to the medical opinion of a source who has examined you than to the medical opinion of a medical source who has not examined you."  20 C.F.R. § 404.1527(c)(1).  While Dr. Brown was an examining source, the state agency reviewers rendered their decision based on a review of the medical records alone.

Second, the Sixth Circuit has recognized the importance of a non-examining source "having a complete medical snapshot" when reviewing a claimant's file.  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 245 (6th Cir. 2007).  This is also emphasized in Social Security Ruling 96-6p, which stated:

> In appropriate circumstances, opinions from State agency … psychological consultants ... may be entitled to greater weight than the opinions of treating or examining sources ... if the State agency... consultant's opinion is based on a review of a complete case record that includes a medical report from a specialist in the individual's particular impairment which provides more detailed and comprehensive information than what was available to the individual's treating source.

Soc. Sec. Rul. 96–6p, 61 Fed. Reg. 34466, 34468 (July 2, 1996).  Here, the state agency consultants completed their review in 2016, long before the ALJ rendered her decision in March 2020.  While Dr. Brown's opinion was likewise rendered in 2016, much of the medical evidence highlighted above was generated one, two, and three years after the state agency opinions.  This is of concern in light of potential inconsistencies between the evidentiary basis for the state agency reviewers' conclusions and the record before the Court.  For example, the state agency consultants addressed Ms. Ferguson's "anger outbursts" by noting she "goes to church and to group with no reported issues" and "is generally described by treatment providers as cooperative and current progress notes indicate she is currently able to control outbursts."  (Tr. 90, 92, 122, 124.)  However, as discussed above, more recent case management records suggest Ms. Ferguson has struggled with managing her anger while participating in peer programming.

In light of the finding in Section VI.B.1.i. that the ALJ failed to build an accurate and logical bridge between the evidence and her conclusion that Dr. Brown's consultative examination was entitled to little weight, the undersigned finds that the ALJ has also failed to build an accurate and logical bridge between the evidence and her conclusion that the dated non-examining opinions of the state agency psychological consultants are entitled to great weight.

The undersigned accordingly recommends that the case be remanded so that the ALJ may provide a full and accurate explanation of the evidence and reasoning that forms the basis for his determination as to the weight given to the opinions of the state agency psychiatric consultants.

## 2.    Whether ALJ Erred in Failing to Order Second Consultative Examination

To the extent that the ALJ could not give greater weight to the opinion of consultative examiner than the two state agency consultants, Ms. Ferguson argues that the ALJ "should have then ordered a consultative examination" because she had "a duty to develop the record."  (ECF

Doc. 16 p. 20 (citing 20 C.F.R. §§ 404.1519a(b), 416.919a(b)).) The Commissioner asserts that "the ALJ did not abuse her discretion by determining that she had enough evidence before her to form a reasonable RFC determination."  (ECF Doc. 19 p. 17.)

Ms. Ferguson's argument that the ALJ had a duty to develop the record by ordering a second consultative examination is not well-taken.  "An ALJ has discretion to determine whether further evidence, such as additional testing or expert testimony, is necessary." *Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001) (citing *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986) ("[T]he regulations do not require an ALJ to refer a claimant to a consultative specialist, but simply grant him the authority to do so if the existing medical sources do not contain sufficient evidence to make a determination.")); *cf. Trandafir v. Comm'r of Soc. Sec.*, 58 F. App'x 113, 115 (6th Cir. 2003) ("Only under special circumstances, i.e., when a claimant is without counsel, is not capable of presenting an effective case, and is unfamiliar with hearing procedures, does an ALJ have a special, heightened duty to develop the record."). Indeed, the Sixth Circuit has "held on several occasions that an ALJ's duty to develop the record did not require the ALJ to order a consultative examination at all." *Cox v. Comm'r of Soc. Sec.*, 615 F. App'x 254, 263 (6th Cir. 2015) (citing *Norman v. Comm'r of Soc. Sec.*, 37 F. App'x 765, 765 (6th Cir. 2002) (unpublished)).

Ms. Ferguson argues that a special duty to develop the record applied in this case because "it is unreasonable for a layperson to conclude on this evidence that Plaintiff is not precluded from work under SSR 85-15 in accordance with Dr. Brown's opinion."  (ECF Doc. 16 p. 20.) The undersigned find this argument unpersuasive, and accordingly makes no specific finding herein as to what weight should be given to Dr. Brown's opinion on remand, what additional

evidence (if any) should be gathered on remand, or what conclusions the ALJ should draw from the evidence as to Ms. Ferguson's ability to perform work as specified in SSR 85-15.

Instead, for the reasons set forth in Section VI.B.1., *supra*, the undersigned finds that the ALJ failed to build an accurate and logical bridge between the evidence and the weight she afforded to the opinions of the consultative examiner and two state agency psychological consultants, as she failed to account for certain evidence and adequately explain her reasoning. It is therefore recommended that the case be remanded so that the ALJ may provide a full and accurate explanation of the evidence and reasoning that forms the basis for the weight given to the three specified medical opinion determinations.

## VII. Recommendation

For the foregoing reasons, the undersigned recommends that the final decision of the Commissioner be **VACATED** and that the case be **REMANDED**, pursuant to 42 U.S.C. § 405(g) sentence four, for further proceedings consistent with this Report and Recommendation.

February 28, 2022

*/s/Amanda M. Knapp*

_____

AMANDA M. KNAPP
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Beauvais*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).